```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA


J.G. et al.,                         :    CIVIL ACTION
                                     :    NO. 17-2613
        Plaintiffs,                  :
                                     :
    v.                               :
                                     :
NEW HOPE-SOLEBURY SCHOOL DISTRICT,   :
                                     :
        Defendant.                   :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              August 27, 2018

This is a case brought under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act ("Section 504"), and the Americans with Disabilities Act ("ADA") by J.G., a special needs student, and his parents ("Parents"). The Parents took J.G. out of public school in New Hope-Solebury School District ("District") and placed him in private school. They then sought reimbursement from the District for J.G.'s private school tuition, arguing that the District denied J.G. a free and appropriate public education ("FAPE"). After a special education hearing officer ruled in favor of the District, the Parents initiated the

instant action for judicial review of the hearing officer's decision.

Before the Court are the parties' cross-motions for disposition on the administrative record. The Parents contend that the District denied J.G. a FAPE in that the individualized education program ("IEP") that it designed and implemented for J.G. was not reasonably calculated to enable him to achieve meaningful educational benefits because (1) in their view, the IEP did not contain sufficiently challenging and ambitious learning goals; and (2) J.G. was unable to meet all of the learning goals in the IEP. The District's position is that the hearing officer's decision was correct and should not be disturbed.

After thorough review, for the reasons set forth below, the Court will affirm the hearing officer's decision in favor of the District.

I. **FACTUAL BACKGROUND**

J.G. is an eleventh grade student who struggles with attention deficient disorder, speech and language impairments, dysgraphia, and learning disabilities. In May 2010, while J.G. was attending a private school, he was privately evaluated by a neuropsychologist, who assessed J.G. intellectually, academically, and behaviorally. See Parents' Exhibit ("P") 4;

School Exhibit ("S") 8.[1] Four months later, J.G. moved with his family to the District and enrolled there in public school. Relying largely on the recent private evaluation, the District identified J.G. as a student with special needs in reading, mathematics, speech, language, and attention difficulties. P-4; S-8. In April 2013, the District re-evaluated J.G., and concluded that he had special needs in reading, mathematics, written expression, pragmatics, expressive speech and language, as well as attention difficulties. P-16; S-24. That same month, the District developed an IEP for J.G. based on the April 2013 evaluation. P-17; S-22. The April 2013 IEP applied to J.G.'s education for most of the 2013-2014 school year. During that time, J.G. also received private tutoring, approximately weekly. P-3; Notes of Testimony ("N.T.") 279-95.

> A. <u>April 2013 IEP</u>

The April 2013 IEP contained two reading goals (comprehension and fluency); two mathematics goals (computation and concepts/application); a written expression goal; and a speech and language goal. S-21. These goals and objectives were detailed and explicit. J.G.'s special education teacher worked with him to achieve these goals, carefully monitored his progress, and prepared regular progress reports. See N.T. 473.

---

[1] Here, as in the administrative hearings, the Parents' exhibits are designated by a "P"; whereas the District's exhibits are designated by an "S" for "School District."

During the term of the April 2013 IEP, J.G. made progress in all but one goal - progressing in both reading goals; both mathematics goals; and in written expression. P-15, 17; S-21, 25. However, J.G. did not make progress towards the speech and language goal, which was to achieve 80% correct on inferential reasoning in social scenarios. P-15, 17; S-21, 25; see also N.T. 448-627. Instead, J.G.'s scores in that area stagnated – remaining at 75% in November 2013 and 75.5% in January 2014. P-15, 17; S-21, 25; see also N.T. 448-627. Based on these results, in March 2014, the District revised J.G.'s IEP for the end of the 2013-2014 school year and most of the 2014-2015 school year. P-22; S-32.

B. March 2014 IEP

The March 2014 IEP contained two reading goals (comprehension and fluency); two mathematics goals (computation and concepts/applications); two written expression goals (convention and style/word choice); and a speech and language goal. P-22; S-32. The IEP included various strategies and accommodations to help J.G. continue to progress. For example, it provided for his math, speech, language, and attention deficit needs by breaking down the problem solving process into single steps and defining math-related language. It also included the use of multi-sensory instruction, including manipulatives. With regard to his written expression needs, it

4

included the use of graphic organizers, journals, checklists, and one-on-one assistance for idea formation and editing. It further provided for various testing accommodations, such as extended time, small groups, paraphrasing of testing directions, using highlighters and calculators, prompting, and the opportunity to have tests read aloud.

During the term of the March 2014 IEP, J.G. again made progress in all goals but one. Specifically, he made progress in both reading goals; both mathematics goals; in speech and language; and in the written expression goal of style/word choice. P-22; S-34. However, J.G. did not make progress in the written expression conventions goal, scoring 69% in June 2014 and then declining to 62.5% in March 2015. P-22; S-34. In contrast, J.G.'s progress in speech and language was so significant that it represented goal mastery, indicating that he no longer needed special services in this area. P-22; S-34.

C. <u>March 2015 IEP</u>

The March 2015 IEP contained two reading goals (comprehension and fluency); one mathematics goal (concepts/application); and two written expression goals. Some changes were later made to the March 2015 IEP in terms of instruction/programming and placement, but the learning goals remained the same. <u>See</u> P-32; S-38, 43, 46, 48, 65. These changes were made after considering the results and recommendations that

resulted from a private evaluation of J.G. in February and April 2015. P-28; S-40, 46.

During the course of the March 2015 IEP, J.G. made progress in both reading comprehension (with scores increasing from 50% to 90%) and reading fluency (130 words per minute at 98% accuracy to 140 words were minute at 97% accuracy). P-35, 45. He also made progress in mathematics (average of 9.7 to average of 15.33) and in the written expression goal regarding grammar, capitalization, and spelling (43% to 90.33%). Id. In the second written expression goal, however, his scores decreased (from 69% to 60.5%). Id.

   D.   February 2016 IEP and private school enrollment

In January 2016, during the term of the March 2015 IEP, the Parents informed the District that they intended to enroll J.G. in private school, and to seek reimbursement for that placement. P-41; NT 38-180. Later that month, the Parents enrolled J.G. in private school for the remainder of the 2015-2016 school year, and submitted a withdrawal form to the District. P-44; NT 38-180. However, in early February, the Parents informed the District that the withdrawal form had been submitted in error. P-46; NT 38-180. That same month, the IEP team met to revise J.G.'s IEP. P-50. As with J.G.'s prior IEPs, the February 2016 IEP included various learning goals tailored to J.G.'s needs, as well as specially-designed instruction and

6

program modifications. See id.; S-58. For example, the IEP included transitional goals to help J.G. in his plan to attend college, and also accounted for J.G.'s potential interest in automotive or welding vocational programs. S-58. However, before this IEP was employed, the Parents again informed the District that J.G. would continue his education in private school for the 2016-2017 school year.[2] P-48, 49.

## II. PROCEDURAL HISTORY

The Parents first brought a special education due process complaint before the Pennsylvania Office for Dispute Resolution. The Parents raised substantive and procedural claims regarding the IEPs and related services that the District provided to J.G. for the 2013-2014; 2014-2015; 2015-2016; and 2016-2017 school years, and the summers of 2015 and 2016. The Parents requested compensatory education, and reimbursement for private school tuition, and private tutoring. The administrative complaint resulted in six hearings before a hearing officer. The hearing process involved briefing, oral argument, and the submission of evidence, including lay and expert testimony.

---

[2] The Parents objected to the admission of the February 2016 IEP at the administrative hearing, arguing that they did not receive it until after they had decided to enroll J.G. in private school, and thus it should not be considered by the hearing officer.

7

After the hearing process was concluded, the parties had time to submit written closing statements.

Subsequently, the hearing officer issued a twenty-two page written decision that included findings of fact, a discussion of the law, and analysis. While the hearing officer found all of the witnesses who testified credible, he afforded the heaviest weight to J.G.'s special education teachers. Ultimately, the hearing officer concluded that the IEPs were reasonably calculated to enable J.G. to achieve meaningful education benefit based on his needs; J.G. had made meaningful, measureable progress across most goal areas, and the instances where J.G. did not make progress were isolated. On that basis, the hearing officer determined that the District had provided J.G. a FAPE, and ruled in favor of the District.

The Parents, on behalf of J.G., then filed the instant action for judicial review of the hearing officer's decision for the District. Subsequently, the Parents and the District both filed motions for disposition on the administrative record. Both motions have been briefed, and are ripe for disposition.

## III. STANDARD OF REVIEW

In considering a challenge to a hearing officer's decision on an IDEA claim, district courts employ a "modified de novo" standard of review. S.H. v. State-Operated Sch. Dist. of

Newark, 336 F.3d 260, 270 (3d Cir. 2003). District courts may reach different decisions than a hearing officer, but must accord the decision of the hearing officer "due weight." Carlisle Area Sch. Dist. v. Scott P. ex rel. Bess P., 62 F.3d 520, 524 (3d Cir. 1995). Under this standard, the hearing officer's factual findings "are to be considered prima facie correct." S.H., 336 F.3d at 270. "[I]f a reviewing court fails to adhere to them, it is obliged to explain why." Id. (brackets in original) (quoting MM ex rel DM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 531 (4th Cir. 2002)). "The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." Id. (quoting MM, 303 F.3d at 531).

Similarly, district courts must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion." Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting Scott P., 62 F.3d at 529). "In this context[,] the word 'justify' demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." Id.

Importantly, "whether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question [ ] of fact." P.P. v. West Chester Area Sch. Dist., 585 F.3d

9

727, 735 (3d Cir. 2009). Finally, "claims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law." Id.

**IV. DISCUSSION**

The Parents contend that the District denied J.G. a FAPE in that the IEPs were not reasonably calculated to enable J.G. to achieve meaningful educational benefits because (1) in their view, the IEPs did not contain sufficiently challenging and ambitious learning goals; and (2) J.G. was unable to meet all of the learning goals in the IEPs.

The District's position is that the hearing officer's decision was correct and should not be disturbed. The District contends that J.G.'s IEPs were reasonably calculated to enable J.G. to achieve meaningful educational benefits, and therefore it provided J.G. a FAPE.

  A.  IDEA

The IDEA requires school districts to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1). Once a child is identified as having a disability under the IDEA, "school districts must work with parents to design an IEP, which is a program of individualized instruction for each special education student." Ridley Sch. Dist. v. M.R., 680 F.3d 260, 269 (3d Cir. 2012). The IEP is "the

10

primary mechanism for delivering a FAPE." Id. (quoting W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995)).

In fashioning an IEP, a school district is not required to provide a specific program or employ a specific methodology requested by the parent. Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty v. Rowley, 458 U.S. 176, 199 (1982). If, however, "parents believe that the school district is not providing a FAPE for their child, they may unilaterally remove him [or her] from the school, enroll him [or her] in a different school, and seek tuition reimbursement for the cost of the alternative placement." Munir v. Pottsville Area Sch. Dist., 723 F.3d 423, 426 (3d Cir. 2013). If, as occurred in this case, a parent does elect to unilaterally remove the child from the school, a district court "may grant the family tuition reimbursement only if it finds that the school district failed to provide a FAPE and that the alternative private placement was appropriate." Id. "Parents who change their child's placement without the consent of state or local officials, however, 'do so at their own financial risk.'" Id. (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985)).

In the present case, "[a]s the party seeking relief and the party challenging the administrative decisions," the Parents bear the burden of persuasion on their IDEA claim. D.K. v. Abington Sch. Dist., 696 F.3d 233, 243 (3d Cir. 2012); see

11

also Ridley, 680 F.3d at 270 ("[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged"). Accordingly, to prevail on the IDEA claim, the Parents must to demonstrate that the District did not provide a FAPE.

B. FAPE

To comply with the IDEA, an "IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential . . . and individual abilities." Ridley, 680 F.3d at 269 (internal citation and quotation marks omitted). "Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." Id. (quoting D.S. v. Bayonne Bd. of Educ., 602 F.3d 553 (3d Cir. 2010)). Accordingly, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 1001 (2017). "This absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Id. (quoting Rowley, 458 U.S. at 206).

A school district is not required to provide the "best" possible education. Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 178 (3d Cir. 1988). An "IEP need not aim for grade-level advancement" if such a goal "is not a reasonable prospect for a child." Endrew F., 137 S. Ct. at 1000. Similarly, a school district is not required to provide each disabled child with opportunities substantially equal to those afforded to children without disabilities. Id. at 1001. Moreover, a school district is not required to "maximize the potential of every handicapped child," rather, it must provide an education that confers a "meaningful benefit" to each child. Ridley, 680 F.3d at 269 (quoting D.S., 602 F.3d at 556). Incremental progress can be meaningful, although a meaningful benefit must be more than minimal. Endrew F., 137 S. Ct. at 1001.

    C.   <u>Whether the District provided a FAPE</u>

As noted, the Parents argue that the District denied J.G. a FAPE because, in their view, the IEP did not contain sufficiently challenging and ambitious learning goals, and because J.G. was unable to meet all of the learning goals in the IEP.

The Parents' contention that the hearing officer erred by not considering whether the goals in J.G.'s IEPs were sufficiently challenging and ambitious is somewhat undercut by

13

their concurrent complaint that J.G. failed to meet all of the goals. Still, in any event, the hearing officer did not commit error in determining that the goals were appropriate without separately considering whether they should have been more ambitious. Rather, in his evaluation of the IEPs, including the learning goals therein, the hearing officer applied the correct legal standard. Namely, he considered whether the IEPs were reasonably calculated to yield meaningful educational benefit and afford J.G. the opportunity for significant learning in light of his individual circumstances. See Endrew F., 137 S. Ct. at 1001; Ridley, 680 F.3d at 268.

Turning to the Parents' second argument, while J.G. did not always progress in every area, and did not meet every learning goal, this does not render his IEPs inappropriate or inadequate. See Ridley, 680 F.3d at 268 (noting that a school district is not required to "maximize the potential of every handicapped child," rather, it must provide an education that confers a "meaningful benefit"). As the hearing officer determined, although there were instances where J.G. did not make progress, those instances were isolated, and the IEPs set forth special education services that enabled J.G. to make significant and meaningful progress.

Additionally, the Parents contend that the hearing officer erred by evaluating the appropriateness of J.G.'s IEPs

14

in the aggregate, rather than individually. However, while the hearing officer did consider the IEPs in the aggregate while evaluating J.G.'s overall progress, he also considered them individually. Moreover, the hearing officer's analysis that refers to the IEPs in the aggregate is included to address the Parents' claims about J.G.'s progress in the aggregate.

Because the hearing officer did not commit error, and the evidence supports the hearing officer's conclusions, the Court will not disturb the hearing officer's determination that the District provided J.G. a FAPE.

D. <u>Independent educational evaluation</u>

The Parents also seek reimbursement for the independent education evaluations ("IEEs") that they obtained for J.G. at their own expense. When parents disagree with the school district's educational evaluation, they may request an IEE at public expense. 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.502(b). Upon receipt of such a request, the educational agency must either initiate a due process hearing to establish that the school district's evaluation was appropriate, or comply with the parents' request. 34 C.F.R. § 300.502(b).

Here, the Parents did not file a request for an IEE. Instead, they simply arranged for a private evaluation in 2010, prior to J.G.'s first year in the District. The Parents then had no objection to the evaluation later conducted by the District,

and both evaluations were considered in crafting J.G.'s IEP. Subsequently, in 2013, the District reevaluated J.G., and again the Parents did not object, but simply arranged for a private evaluation, and again both were considered in revising J.G.'s IEP. While the Parents did claim that they requested another evaluation in 2015, they brought forth no evidence supporting this claim for the hearing officer to consider. Thus, to the extent that the Parents contend that the hearing officer erred by not separately addressing this claim in his written decision, in the context of the full record, this was not error by the hearing officer.

    E.    Section 505 and ADA

Finally, the Parents bring claims under Section 505 and the ADA, alleging that the District acted with deliberate indifference to J.G.'s educational needs, and thereby denied him equal services because of his disabilities. Even to the extent that these claims do not rise and fall with the IDEA claim, they are without merit. To prevail on either claim, the Parents would need to demonstrate discrimination, which could be met by showing an intent to discriminate or deliberate indifference to a substantial likelihood of harm to a federally-protected right and a failure to act upon that likelihood. See, e.g., S.H. ex rel Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 262 (3d Cir. 2013); Chambers v. Sch. Dist. of Phila., 537 Fed. App'x 90,

96 (3d Cir. 2013) (non-precedential). However, here there is no evidence that demonstrates discrimination, either intentional or with deliberate indifference. Accordingly, both claims fail.

## V. CONCLUSION

For the reasons set forth above, the Court will affirm the hearing officer's decision in favor of the District.

An appropriate order follows.